Good morning, Your Honors. My name is Donnie Cox. I represent Mr. Marsh, along with my co-counsel, Mr. Ashley and Mr. Leahy, and they may jump in. I'll sit down, obviously, if there's an issue that's raised, because there are a myriad of issues in this case. Ken Marsh was prosecuted in this case, and he spent 21 years in prison for a crime that the State of California now admits never happened. I'm not sure they admitted that. They declined to re-prosecute him. No, Your Honor. Actually, the State of California has declared Ken Marsh factually innocent. The P.C. 4900 hearing, in this case, declares him to be a factually innocent man. In order to qualify under P.C. 4900, he has to show his factual innocence. As a result of, the prosecution was the result of a theory that the claim that Mr. Marsh made that the fall that killed Philip was from the back of a couch, and the theory was that no child could die as a result of a shortfall from the back of a couch, for three feet or less. Proponent of that theory was Dr. David Chadwick. We're here today because the district court, instead of indulging inferences in favor of the non-moving party, accepted the evidence and weighed the evidence in this case, particularly the evidence as it pertains to Dr. Chadwick, and with regard to the Monell claims that were made by the plaintiffs, as well as the Brady claims. What do you have to show in order to recover civilly from the two individual defendants? What's the standard that your client has to satisfy? The standard that he has to satisfy, Your Honor, was that David Chadwick was the moving force behind the prosecution in this case. No, just give me the legal standard. Excuse me? Give me the legal standard. That is the legal standard. What's the required scienter for the defendants? That he misrepresented facts, that he lied, that he, that the prosecutor in this case prosecuted based on misrepresentations by the defendants. And we believe that No, I'm still trying to get a legal standard out of you. Intentional misrepresentation is required? It's either intentional misrepresentation or reckless misrepresentation, according to Galba. Okay. And in this case, we have a myriad of evidence that Dr. Chadwick knew when he stated in 1983 that shortfalls could not cause the kind of injury that Philip had. That's not true. He said in his deposition in 2007 that he knew that shortfalls could cause fatal brain injuries. He said in, excuse me, the evidence is that he not only said that the kind of brain injury Philip had back in 1983 could not have been caused by a fall from the back of the couch, but he also said that you couldn't have any sort of fatal injury as a result of a shortfall. And he said that. He said that in the preliminary hearing. He told that to Dr. Williams. Dr. Williams said that in his deposition. He told, he was at a death review hearing the day that the prosecution filed their case in this case. And he told everybody at that, he told the prosecutor at that hearing, at that meeting rather, that it would take a three to four story fall in order to cause the kind of brain injury that Philip had. Again, a reasonable jury could disagree with this. But there is enough evidence. There's an inference there that can be drawn that Dr. Chadwick was the moving force, first of all, he was the moving force behind the prosecution, that he misrepresented those facts. And as a result of that, Mr. Mark spent 21 years in prison. And, you know, it's, there's just, there's so much information about Dr. Chadwick and what he did and what he knew back during that time. He says in his medical records review that the sort of brain injury that Philip had cannot result from the fall from the back of the couch or, in fact, from any short distance normal fall within a household. He said it again in the death review committee meetings on June 30, 1983. He told Dr. Williams the same thing during that time. He said in the preliminary hearing, the height of a fall and the amount of force that he generated is not sufficient to cause a fatal head injury. All of these, all of these things turned out not to be true. As late as 2006, he was writing letters to his cohorts saying that Dr. Galino, the expert who was hired by the county to review Dr. Chadwick and Dr. Williams' work, had now joined the small band of, he referred to them as the small band that believes that shortfalls may cause fatal head injuries. Then in 2007, a few months later, he admits that he did not believe what he said in 1983. In his deposition, he said a fatal head injury can occur as the result of a fall from an elevated surface three feet above the floor. And I'm sorry, the date of that deposition again? It was November, November of 2007. And that's how long after the time that we used to claim that he was misrepresenting? He was misrepresenting these facts all the way up to 2006. But the operative time that you're concerned about is when? 1983. So we're now talking 24 years later, he says, I don't think that was correct. Correct. And most importantly, he says, I knew it in 1983. Where does he say that? In his deposition, he says. Can you read it to me? Give us a cite to his deposition where you're saying. It's at volume three of the excerpts of record. Page 429, starting at line 22 through 430. Say line, sorry again. I'm sorry. Page 429, line 22 through 430. Through 430? Through page 430. Oh, through page 430. I believe it's line 6 or 7. No, okay. I don't have this in front of me. Maybe it's fairly short. Could you just read me the language slowly so I can hear it? Okay. At the time of the deposition, he's being read a quote from a colleague of Dr. Williams. You're talking about Dr. Chadwick's deposition and not Dr. Williams? I'm sorry, I apologize. Dr. Chadwick is being read a quote from a colleague of Dr. Chadwick. It starts at line 23. If you look at the third paragraph of this email, Dr. Spivak writes, quote, I find, however, that I agree with Dr. Galino's contention, quote, that a fatal head injury can occur as a result of a fall from an elevated surface three feet above the floor, end quote. Do you see that there? Yes. Do you agree with that? Yes. Did you hold that same belief back in 1983? Yes, I did. Okay. Dr. Chadwick was a proponent of shortfall theory. Dr. Chadwick has been fighting this battle for a long time. For the last 30-some years. One of the reasons that we introduced evidence of five other cases involving Dr. Chadwick's misrepresentation in these particular instances was to show that Dr. Chadwick continued to push this theory, even knowing, as he says now in 1983, that these could have occurred. He still was claiming all the way up to 2006 that they couldn't, including in five other cases where children died as a result of shortfalls, and Dr. Chadwick opined that they could not have died as a result of those shortfalls. That's the basis of our theory. Just as importantly, the county of San Diego was well aware that Dr. Chadwick held these opinions, and they were well aware that his credibility was at issue. And they should have known, started knowing this back at the time that they prosecuted Kent. What other evidence was there in the record beside the injury from this particular brain injury? What other evidence was there to suggest that your client might have been abusing Philip? Was there some? Well, Your Honor, at the time of the trial, there was no other evidence that was presented. There was, there were prior injuries that Philip had, and Dr. Chadwick opined in his medical record summary that all of these were suspicious for abuse. What Dr. Chadwick didn't say in that medical record summary was that Ken Marsh either was not present for any of those, when any of those injuries occurred. Was he in the house? Excuse me? Was he in the house? He wasn't even in the house for three or four of them, and two of them he was in the house, and there were two other people present, and he was actually in a cask, so he couldn't get around. And as a matter of fact, that evidence wasn't used at the time of trial for that very reason. But I'm interested not so much in terms of whether the conviction was based properly on what evidence was presented, but in the sense that this goes to the moving force question. Correct. Yes. The moving force question is very simply stated by the prosecutor in this case. He used the moving force for the prosecution. He said in his opening statement that the injury could not have occurred the way that Mr. Marsh said it occurred, he said in his, during the time of trial, all the witnesses were called to testify that it just couldn't have happened this way because shortfalls can't cause this kind of an injury. And then in his closing argument, he says again, Mr. Marsh, the theory that Mr. Marsh puts forward that these shortfalls could have killed Philip just doesn't fly. It could not have happened that way because shortfalls cannot kill. My impression is during this period, the 1980s and so on, not limited to San Diego, right or wrong, the overwhelming assumption was if a small child is badly injured or killed while the boyfriend lives in the house, the boyfriend did it. Right or wrong, that is the perception, Your Honor. And unfortunately... That is how the prosecutors behaved then, right or wrong. That's true, Your Honor. But they also have to have a theory for why it happened. Dr. Chadwick and Dr. Williams, by the way. Dr. Williams... But that goes to the moving force question again. It does, Your Honor. And Dr. Chadwick, without Dr. Chadwick's testimony, without Dr. Chadwick, Dr. Chadwick started this process. Dr. Chadwick... Wasn't he required under state law? To report? Wasn't there a mandatory reporting for suspicion of child abuse? Dr. Chadwick... Dr. Chadwick was not a mandated reporter or was not the mandated reporter in this case. The nurse practitioner was the mandated reporter. And in addition to that, Dr. Chadwick was actually hired to investigate the death of Phillip Buell. He wasn't simply somebody who reported what he saw. He got involved in the investigation. That's why he did the medical record review. That's why he attended the death review committee meetings in May and in June of 1983. That's why he was the guy who was telling the prosecutor that it took a three to four story fall to cause the kind of brain injury that killed Phillip. At the death review committee meeting on June 30th of 1983, and I have the site for that too, it is volume three, excuse me, volume two, page 182. There are handwritten notes made by the prosecutor. And under one section it talks about the, what killed Phillip. What killed Phillip was the cerebral edema, bleeding on the brain. And there's notations about massive swelling of the brain. And then next to it, there's a CH that indicates that it was made by David Chadwick. The comment was made by David Chadwick. And it says three to four story, third to four story fall. And so the indication is that the only way that you could get the kind of bleeding that Phillip had was in a third or four story fall. And that was just simply not true. And again, Your Honor, what happened is, if you look at Dr. Galino's report, Dr. Galino said that there were lots of treatises back in the day that children couldn't die as a result of shortfalls. And that is definitely true. But Dr. Chadwick is the proponent of those treatises. He's the guy who steps up to the plate and says, no, you can't die as a result of this. He's even written papers about it. He has a vested interest in making sure that the shortfall theory remains intact. Because it's his theory. And he's built his reputation as a child abuse expert on that theory. Well, on this moving force issue, did not the prosecutor, it's in the record, I believe, in the deposition or declaration otherwise, state that his prosecutorial decision was based on reports of law enforcement officers and doctors. And that, in Dr. Chadwick's opinion, there were evidently four doctors who treated the child before death. And then there was Dr. Chadwick and Dr. Williams. And all agreed that the death certainly was not an accident. Your Honor, if you, first of all, the police officers in this case never thought that Mr. Marsh was guilty. The police officer, the chief investigator in this case, Detective Arnijo, did a declaration for us in our motion in this case, which is part of the record, that indicated that he went to the prosecutor and told the prosecutor that he didn't think that Mr. Marsh was guilty and he thought that this was a case of accidental death. The main reason for that was that there was no blood at the scene and the doctors kept insisting that there would be blood at the scene. And there was not only no blood at the scene where Philip was found, but there was really no way for Mr. Marsh to have transported the child back to the scene. He had no car. He was also taking care of another little child. And in addition to that, the police took him down to the police station that afternoon and did a forensic look for his, for his, for blood on his hands. With regard to the other physicians involved in the case, I once again urge you to look at page 182 of the excerpts of the record, because the only other physician who was at that meeting, that was that next day that the, that the complaint was, excuse me, that day that the complaint was filed, the only two physicians that were at that meeting were Dr. Williams and Dr. Chadwick. All right. Thank you, counsel. Your time is, well, you're over your time. Thank you. Good morning, Your Honors. Colin Murray appearing on behalf of Lady Children's Hospital and also Dr. Chadwick. This is a, obviously a tragic case, but the evidence supporting the decision to report child abuse in April of 1983 was overwhelming. This little boy came into the hospital brain dead with not just a subdural hematoma, but severe diffuse brain injury and a constellation of other injuries, including two broken hands, a varying age of fracture. Dr. Chadwick was not the first pediatrician to examine the child and to, to determine that there was a potential for child abuse in this case. This child was suspected to have been the victim of child abuse by the paramedic, by the emergency room physician who initially observed him at Alvarado Hospital, by the transport physician from Children's Hospital, Dr. Johnston, by the director of the ICU, Dr. Peterson, by Dr. Kaufman, who was responsible for the CHET team, and eventually Dr. Chadwick. The appellant's experts conceded at their depositions that reporting child abuse faced with this constellation of injuries this child had was, in fact, the right thing to do. So appellants can't take issue with the fact of the reporting. It's also undisputed that the trial testimony is protected. It is immune from prosecution under Briscoe and Franklin v. Turf. So the question then becomes, did something happen in between the active reporting, the initial active reporting, and the trial, which converted this into some sort of moving force behind the prosecution? Now, I wish to note initially in response to Judge Timlin's question, the trial prosecutor was deposed in this case, and he swore out an affidavit in which he said his will was not overborne by Dr. Chadwick, that he exercised his own independent prosecutorial discretion in deciding to charge this case. And he said he did it in part based on the medical evidence, but largely because Kenneth Marsh's story did not line up with the physical evidence at the scene. The little boy had a gash in the back of his neck that was two centimeters, or just about an inch deep, and yet there was no blood, nothing, found in the area where Ken Marsh said the child had fallen. The glass at the crime scene, according to the prosecutor, didn't line up with the nature of the cuts in the back of the child's neck. So Jay Coulter filed this case based on the crime scene evidence as well as the medical evidence, and he exercised independent prosecutorial discretion in doing so. So the question becomes, where exactly was the cut on the boy's neck? Right in the back of the neck. There's actually three cuts in the back of his neck, three. So was it reasonable for Dr. Chadwick to suspect abuse? Absolutely. What evidence do we have as to the age of those cuts? Fresh. Fresh cuts inflicted that day. So Dr. Chadwick's opinion was that they should have bled. They're cuts. They're cuts that go near the occipital bone in the spinal cord. So the absence of blood at the crime scene was a critical factor that the prosecutor took into consideration. A misstatement was made during my colleague's statement. He said that Dr. Chadwick was, quote, to write the medical record summary in this case. Not so. He wrote it because he thought it was the right thing to do. The child had been a patient at Kaiser Hospital for many years, for two years anyway. Those records were then sent to Children's Hospital. Dr. Chadwick reviewed them and summarized them. And when he did so, he found what he perceived to be an unmistakable pattern of abuse, because the child was coming into the hospital time and time again with another injury that he believed... How many times had that boy been into the hospital when you say time and time again? Five or six. I can give you... And for those times, was Mr. Marsh living in the house? Well, he was. He had moved into the house. But that wasn't something that Dr. Chadwick was looking at. He was not investigating or accusing Marsh. He looked at the records and then summed up what those records said and then formed a conclusion at the end that he believed they were consistent with child abuse. Now, the fact of the matter is that those traumatic-type incidents began to occur shortly after Kenneth Marsh had moved into the house. And the kinds of injuries that he was showing up with were not insignificant.  On one occasion, he was hospitalized in shock with significant intra-abdominal bleeding. These were not, you know, small matters. On another occasion, I think about a month or so before his death in March, he came in. His hand was swollen. It was examined. No fracture on the swollen hand. But the other hand was examined, and it was fractured, an older fracture, a fracture that showed up at the time of autopsy. So, again, this is the evidence that Dr. Chadwick was looking at when he made the report of abuse. Okay, counsel, let me ask. Yes. So on the intentional falsification prong, your opposing counsel points to deposition testimony of Dr. Chadwick and argues that it demonstrates intentional falsification. What's your response to that? Very simple. There is a very significant difference between holding the opinion, which he's always held, that shortfalls can be fatal, albeit very rarely, very rarely, and saying, on the other hand, that the sort of brain injuries that this particular child had, in his opinion, could not be caused by a shortfall. They are not mutually exclusive of one another. And what do we know about what Dr. Chadwick said to the prosecutor and to others as they were deciding whether to prosecute? Did he say, as you said, they're very rare, or did he say they can't happen? He said, with respect to shortfalls generally, his opinion has always been the same, that, yes, it's possible, but he believes, his own opinion is, and this was, as the Court pointed out, the conventional wisdom at the time, that most doctors believed that they were very, very rare, and that was Dr. Chadwick's opinion. In this particular case, he looked at Philip's brain injury, which, again, wasn't just a simple subdural hematoma. We're talking diffuse bleeding throughout this child's brain, and he said, no, a shortfall from three feet can't cause this. That was his cause this. Now, let me ask you, I understand that trial testimony is privileged, but let me ask you what he testified to, because that may give me a hint as to what he said to the prosecutor before the trial. What did he testify to? What he testified to was that, in his opinion, it was very unlikely that the injuries Philip suffered could have been caused by a shortfall, and that they were more consistent with a fall of, say, eight to ten feet. Did he ever say at trial that shortfalls don't cause or can't cause death? No. Okay. He did not. Counsel, I thought you were dividing up your time. I'm so sorry, Your Honor. You're losing the time to divide. I apologize very much. Thank you. Yes, I'll be brief. Good morning. Deborah McCarthy on behalf of the County of San Diego, Dr. Roger Williams, and Max Murphy. The moving force behind this prosecution was the crime scene evidence. That's it. The explanation Mr. Marsh gave would have required an acrobatic fall that could probably never be duplicated. There were multiple impact sites on this child. The experts that the defense tried to retain to come into court and testify on Mr. Marsh's behalf said, we can't help you with this case. There are too many impact sites on this young boy to explain all the injuries he has from a fall from a couch. Mr. Coulter, the prosecutor, was compelled by the scene evidence. Zero blood at the scene. No glass in the back of his head which they purported caused these three parallel incised wounds. No glass there. No blood on the glass that purportedly caused the wounds. And a crazy explanation as to how this all transpired to begin with, that Mr. Marsh moved a couch away from the wall to get a book that Philip wanted. Mr. Marsh left the room, left the book there to go get a vacuum cleaner to clean up behind the couch, and somehow Philip, rather than walking around the couch, climbed on the back spine of his couch, fell backwards, hit an ashtray, hit a fireplace heart, bounced on the floor, and died. So it was the crime scene evidence that was the motivating force behind this prosecution. Furthermore, the standard, as your honors asked in the beginning, is reckless disregard or deliberate falsification. Every expert in this case, including every expert Mr. Marsh retained, we have traveled to Philadelphia, St. Louis, Louisville, Palo Alto, Chicago. Every single one said two things. Dr. Williams did not lie. He did not falsify the autopsy. He did a competent autopsy. He was competent to perform the autopsy. And most importantly, this case is extremely problematic for abuse. And Judge Fletcher, you mentioned in the 80s the thought was the boyfriend always did it. The truth here is Mr. Marsh moved in in November of 1982. Philip died in April of 1983. In that six-month period, this little boy suffered multiple injuries, including two fractured hands, that were never treated. Nobody ever took him to the hospital. He was rushed to the hospital with a ruptured spleen, believed to be, in January of 83, and he stayed in that hospital for three weeks. And the pediatrician who treated Philip from the day he was born until the day that he died was convinced that Mr. Marsh had inflicted that ruptured spleen or potential ruptured spleen injury. So there is no evidence in this case to support their claims, to support the burden they must meet. And lastly, he was never declared factually innocent. He did not go through that procedure. He went to Sacramento, and the Attorney General rolled over, put up no opposition to his case. And I leave it to you to figure out why that happened. But he was never, never found factually innocent. All right. Thank you, counsel. You have three minutes. You have three minutes left. You have three minutes left. Oh, we do? If I may, thank you. I'm not pretty sure. Am I looking at this right? Yeah, that's right. Yeah. Yeah, you're right. Thank you. The construct that I was operating under during my initial remarks was that if everyone agrees, it was reasonable to report abuse. And if the trial testimony is immune from liability, the question is, did something happen in between that is a violation of Kenneth Marsha's rights? And what Dr. Chadwick did was summarize the medical record, and he did it accurately. And he attended two meetings. Those meetings are precisely what the California legislature wants child abuse physicians to do. They are interdisciplinary meetings where social workers and law enforcement can attend to discuss what's going on with a particular suspected case. There's nothing about those that suggests that Dr. Chadwick or Dr. Williams stepped over the line to engage in intentionally tortious behavior. I would ask the court to not necessarily accept at face value some of the representations regarding the evidence in this case. For example, during opening argument, it was represented that Dr. Chadwick said at the second of those physical abuse review committee meetings that Philip's injuries could only have been caused by a fall from a third or fourth story fall. And there's no evidence that he ever said that. Counsel, we have the record, and we've reviewed it. Thank you. So you don't need to point us to the record if you want to sum up. Okay. Thank you. In closing, there's ample evidence of probable cause in this case, but most importantly, the record before Your Honors is lacking of any evidence that Dr. Chadwick can hold the beliefs, the opinions that he expressed at that time. Thank you. Thank you. Do you use, okay. Do the appellants have any time left? No. They don't. They've used up their time. You went over your time. Yes, I apologize. Well, it's all right. Thank you. We have the record. We have the briefs. We have everything before us. In the case, Marsh v. County of San Diego will be submitted, and we will take up
judges: Timlin, Wardlaw, Fletcher W.